```
                                        Pages 1 - 14

           UNITED STATES DISTRICT COURT

         NORTHERN DISTRICT OF CALIFORNIA

    BEFORE THE HONORABLE PHYLLIS J. HAMILTON, JUDGE


UNITED STATES OF AMERICA,        )
                                 )
         Plaintiff,              )
                                 )
  vs.                            )  NO. CR 07-0325 PJH
                                 )
DIANA HOJSAK,                    )
                                 )  San Francisco, California
         Defendant.              )  Monday
                                 )  May 19, 2008

              EXCERPT OF PROCEEDINGS


APPEARANCES:


For Plaintiff:       JOSEPH P. RUSSONIELLO
                     United States Attorney
                     450 Golden Gate Avenue
                     San Francisco, California  94102
                BY:  CYNTHIA STIER
                     THOMAS NEWMAN
                     Assistant United States Attorneys

For Defendant:       Sugarman & Cannon
                     44 Montgomery Street, Suite 2080
                     San Francisco, California  94104
                BY:  CHRISTOPHER J. CANNON, ESQ.




Reported By:    Belle Ball, CSR  8785, RMR, CRR
                Official Reporter - US District Court
```

1           **E X C E R P T   O F   P R O C E E D I N G S**

2    **MONDAY, MAY 19, 2008**

3           **THE COURT:**  All right.  Mr. Cannon, do you wish to

4    make a statement?

5           **MR. CANNON:**  Thank you, Your Honor.

6           Good afternoon, ladies and gentlemen.  I'll try to be

7    pretty brief, because it's important, everybody wants to get

8    home.

9           But I want to make sure, before you go home, you

10   understand that there are two sides to this story.  And I just

11   want to give you the framework and our version of what the

12   facts will show.  Because those facts will show that Diana

13   Hojsak is not guilty of tax evasion, she is not guilty of

14   filing a false tax return.

15          We don't dispute the numbers that the Government just

16   put up on the white board.  Ms. Hojsak has given those numbers

17   out multiple times.  She gave them out in civil litigation; she

18   gave them to the Government.  Those numbers simply aren't

19   disputed.

20          What's disputed in this case is, one, whether there's

21   any tax liability at all.  And two, whether Ms. Hojsak

22   willfully evaded any taxes.  And the answers to both of those

23   questions are the same.  And to both of them, it's a resounding

24   no, and that's what the evidence is going to show.

25          I just want to emphasize the framework that you are

1  going to have to use to decide this case.  And the framework in
2  this case is for the Government to satisfy its burden of proof,
3  it's got to show beyond a reasonable doubt that Ms. Hojsak sat
4  down, tried to violate U.S. tax laws.  There is no way that
5  that's going to happen.  Because the evidence isn't going to
6  support that.  Circumstantial evidence isn't going to support
7  that; direct evident is not going to support that.  And I'll
8  explain to you what the evidence will show, and why the
9  evidence will not show it.
10         The evidence will show that Diana Hojsak is the
11 victim of a bad-faith breach of contract by a giant Chinese
12 company, YOFC, that decided not to live up to its contract, and
13 convinced the IRS to help it crush Diana Hojsak.
14         This case is about many things, but it's based upon a
15 disputed contract and a disputed business deal between Diana
16 Hojsak and YOFC, a company these's two-thirds owned by the
17 Chinese government.
18         After the Chinese government decided not to pay the
19 money that they owed to Diana Hojsak, they enlisted the U.S. to
20 try to help them to make sure that they wouldn't -- that she
21 wouldn't -- that they wouldn't have to pay the money that was
22 owed.  And this was money that was owed on income earned
23 entirely in China, which had already been taxed, which -- which
24 had already been taxed in China.  The facts of the matter are
25 that Diana didn't owe any taxes, and that she did everything

1  she could do to make sure that her taxes were filed properly
2  and appropriately in this -- in the United States.
3        You will learn that at the end of the day, that this
4  is simply the result of the breach of the contract and
5  subsequent litigation.  That the breach of the contract led to
6  a loss, not to a profit, and there is simply no taxes owed.
7        What the evidence is going to show is that Diana
8  Hojsak is a bright, hard-working woman, who grew up at the time
9  of the cultural revolution in China.  Her parents instilled in
10 her a desire to do tremendously well, and she did well.  She
11 did well in school, she did well in business.
12       She worked in the securities business; she worked for
13 Corning; she worked for a fiber company, towards Draxler.  And
14 after being in the business for a while, she decided to set up
15 her own business as a sales agent for fiber optics in the
16 United States -- in China.
17       She decided -- she couldn't decide whether she would
18 represent Corning, or whether she would represents Sumitomo, or
19 whether she did she would represent Draxler until, while she
20 was making this decision, YOFC approached her.  YOFC tried to
21 convince Diana to sell their product.  Because up until that
22 time, YOFC had been unable to sell their own fiber in the
23 Chinese market because Chinese companies didn't want to buy
24 YOFC fiber, because it was perceived to be inferior.
25       Diana was such a good saleswoman and had such a good

1   history that YOFC approached her, and wanted her to open the
2   sales mark for YOFC products.  And this was really important to
3   YOFC, because YOFC is a huge company, and the Chinese market is
4   a huge company.
5          And if you will remember, this was around, you know,
6   the time of the Internet boom, when everybody was laying
7   optical fiber everywhere, because optical fiber is the backbone
8   of the Internet.  And that's what Diana was doing.  She was
9   selling huge amounts of optical fiber in China, that she got
10  from YOFC.  So, as soon as Diana signed on, both her fortunes
11  and the fortunes of YOFC dramatically improved.  She sold
12  kilometer after 100,000, after a second 100,000 mile of
13  kilometer.
14         And, it's the same situation that happens any time
15  you are in the sales business.  Once the company realizes the
16  salesman -- or saleswoman in this case -- is making a lot of
17  money, they try to squeeze the person, because they don't like
18  paying the commissions.  And that's what happened here.
19         The representation agreement that the Government's
20  talking about gave Diana the exclusive right to sell YOFC fiber
21  in China.  YOFC didn't like it because Diana was paying so --
22  was selling so much fiber that was that -- she was entitled to
23  very large commissions.
24         So YOFC decided that they're going to not give her
25  the fiber that she had already sold, they were going to claim

1    that there was a shortage, they were going to go behind her
2    back, that they were going to sell fiber through another
3    company that was set up by a former member of the board of
4    YOFC.
5           The problem with this theory was one, Diana had --
6    that there wasn't a shortage; two, that Diana had a contract
7    that gave her an exclusive right to sell that fiber.  This was
8    a clear breach of contract.
9           And, not only did this breach of contract prevent
10   Diana from earning the commissions that she was entitled to, it
11   prevented her from continuing in business, representing other
12   companies, because they undermined her credibility as a
13   saleswoman.  She told all these customers that she could
14   deliver fiber, that she would be able to deliver it, it was a
15   quality product, and YOFC completely cut their legs out from
16   under her.
17          Diana's tough, and she didn't take this lying down.
18   As I'm sure you all understand, litigation is a touch business.
19   And YOFC, owned by the Chinese government, didn't take kindly
20   to being opposed by an aggressive woman salesman.  They left no
21   stone unturned in trying to fight, in an attempt to cheat Diana
22   out of what was rightfully hers.  Ultimately, after a long
23   fight, the case was settled.
24          As I'm sure you all understand, litigation is ugly,
25   expensive, and litigation for principal is unbelievably

1   expensive.  And Diana spent more money on litigation than she
2   ever made on commissions selling this fiber.
3           Exhausted after spending all this money, after
4   running out of money, Diana settled the case.  Almost as soon
5   as she settled the civil case, she was charged in this case.
6   And, the thing is this isn't just a coincidence, because while
7   the civil case had been going on, unbeknownst to Diana, YOFC
8   had been feeding information to the IRS, and had been using
9   that information to get an advantage in the civil case.
10          As soon as this case was settled, while the
11  arbitration was actually going on, one of the YOFC witnesses
12  who is going to come into court and testify supposedly walked
13  in to the IRS.  He just -- he was at an arbitration.  He was
14  testifying.  He was trying to get away from the breach of
15  contract.
16          The next day, he literally walks into the IRS and
17  says, "Well, you guys should really look at Diana Hojsak,
18  because this money's going into an account in China."  What he
19  didn't tell the IRS, what's never been contested, is that there
20  was nothing wrong, sending the money into the account into Hong
21  Kong.  And it was always disclosed that the money was being
22  sent into this account in Hong Kong.  There was simply nothing
23  wrong.
24          This wasn't a case where the IRS sent out IDRs, asked
25  Diana what was going on.  This isn't a case where some records

1    were summoned.  This isn't a case where someone wanted to audit
2    a tax return.  This is case that in the middle of litigation
3    over breach of contract with a company owned by the Chinese
4    government, that company walks in and tells IRS, "You really
5    have to help us out and prosecute this person, because it will
6    help us in our civil case."  Well, that's exactly what
7    happened, and that's why we're here.
8            And, when you look at the evidence in this case, the
9    evidence is going to show you that Diana did every -- you are
10   going see a lot of documents.  You are going to hear from
11   accountants, you are going to hear from experts, you are going
12   to hear from the people that were there.
13           And this will show that Diana had an accountancy firm
14   here in the U.S., Teng Accountancy in San Jose, to handle her
15   filings of tax returns.  And she also had a woman in China by
16   the name of Una Lu.  And Una Lu was a Chinese accountant who
17   was hired to keep the books in the Shenzhen office.  She was in
18   direct contact with Teng Accountancy in San Jose.  Diana was
19   out of the loop.
20           If Teng needed some information, they would ask Una
21   for it.  If Una needed information, she would ask Teng for it.
22   You will be able to see the e-mails going back and forth.  You
23   will be able to see, you know, they attached Quick Books.
24   Nothing was ever hidden.  All of this was completely done on
25   the surface.  And Diana was out of the loop.

1    Diana's a saleswoman.  She's not a tax accountant.
2    That's why she had an accountant in Shenzhen, where the main
3    office was, where there were six or seven employees, where the
4    product was sold; and she had an accountant here in the U.S. to
5    handle tax returns in the U.S.  This isn't a case where she
6    simply was trying to hide the money, as the Government's
7    claiming.
8        What the Government has shown you, they think is the
9    evidence of some sinister plot.  It's not.  There's a simple
10   reason that the money was paid to Hong Kong.  And that's
11   because it was paid there to pay for consulting services
12   performed by Michael Yell.  Those services were performed
13   outside the United States, and were vital to the success of ATI
14   and Diana.
15       Michael Yell is a prominent Australian businessman --
16   executive with a tremendous amount of experience in the Chinese
17   market.  Diana and Michael had known each other since the
18   Nineties.
19       Some of you may remember the big Asian market crash
20   in 1997.  If you think the subprime cash and the credit freeze
21   we are having in the United States right now is bad, the Asian
22   market currency prices in '97 was a complete disaster.  And it
23   was a complete disaster for Michael Yell and Diana, because
24   they were investing together.  And as a result of that currency
25   crash in 1997, Michael Yell ended up owing Diana a couple of

1   million dollars.  And Diana obviously wanted to get that money
2   back.  Michael wanted to pay back.  And they were trying to
3   figure out how this could be done.
4          Michael agreed to act as a consultant for Diana and
5   ATI.  And he agreed to roll over his fees.  That is -- when
6   Diana was setting up the business, it cost a lot of money to
7   set up a business.  You have to hire employees in China, you
8   have to travel around China.  You have to entertain.  You have
9   to do everything that's required to do a sales job, when you
10  are selling Chinese materials to Chinese companies, in China.
11         And for the first year and a half, no money was made.
12  So Michael agreed to let his commissions and his consulting
13  fees roll over until there was a cash flow.
14         And that's what happened.  Once the business would
15  have been profitable, once the business would have started
16  making money, Michael wanted to get -- Michael wanted to get
17  paid, and Michael was paid, and that's why the money went into
18  the Michael Yell account in Hong Kong.
19         Michael then used the same money that he was being
20  paid for his consulting services to pay Diana back the money
21  that he owed her that was lost in the Asian currency prices.
22  That's really what happened.
23         These transactions are simply a wash.  There's no tax
24  liability, there were legitimate expenses paid to Michael Yell.
25         Now, I admit, and Diana would probably admit, knowing

1   what she knows now, that this was not a good way to handle her
2   books.  It was a foolish way to handle her books.  But the
3   problem was, she thought it was a reasonable way to handle her
4   books, because that's what her accountants told her to do.  Una
5   Lu said this was a wash, go ahead, deal with the transaction
6   this way.  It's a wash, there's no tax liability on it.  And,
7   Una wanted to handle it that way because there was a problem.
8           As you'll hear, YOFC was very, very slow in making
9   payments.  The reason they were slow in making payments,
10  because any dollar payment coming out of China has to be
11  approved by the Chinese currency control office.  It goes
12  through a government organization called SAFE.  There's
13  withholding, and you have to go to the provincial office, and
14  then you have to go to the government office.
15          Una thought it would be easier to get paid, people
16  would get paid more quickly in the money wouldn't go directly
17  to the United States, if it would go to Hong Kong first.  So
18  Una said, "Let's put it in a Hong Kong account, because Hong
19  Kong's part of China, the approvals will be quicker, we'll get
20  the money more quickly."
21          Well, it didn't really happen that way, but that's
22  the business reason why the money was sent to Hong Kong rather
23  than the United States.  It's hard to get dollars out of Hong
24  Kong, and when you have to get the approval of the Chinese
25  Government, when you are dealing with a company that is

1   two-thirds owned by the Chinese government, Una thought the
2   good deal to deal with this contract was to have it go to Hong
3   Kong instead of the United States.
4            Well, it was a bad idea, and that's why we're here
5   today.  But it wasn't a criminal idea.  The evidence will be
6   that everybody that participated in this didn't think it was
7   criminal, wasn't trying to violate any tax laws, was just
8   simply trying to figure out how they could get paid.  For
9   Diana, who is a salesman, not an accountant, didn't go to
10  school in the United States, went to school in China, never
11  really came to the United States until the Nineties, this all
12  seemed completely reasonable.
13           Since the end of 2000, Diana has learned a tremendous
14  amount about taxes, business and litigation.  If she knew in
15  2000 what she knows now, these transactions would have been
16  structured differently.
17           But, the evidence will conclusively show that she
18  didn't think she was violating the law when these transactions
19  happened, that there was nothing illegal about the
20  transactions, that Diana didn't willfully violate the U.S. tax
21  laws.
22           And, the evidence in this case will overwhelmingly
23  point to the conclusion that she did not intend to violate the
24  U.S. tax law, and that she's not guilty of the crime that she's
25  charged with.

1           Thank you.
2           (Conclusion of excerpted portion of proceedings)

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in CR 07-0325 PJH, United States v. Diana Hojsak, were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

_____

Belle Ball, CSR 8785, CRR, RMR

Monday, May 19, 2008